IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------X
JOSEPH DAWSON,
460 Hidden Spring Lane
Drain, OR 97435,

    Plaintiff,

vs.

SECRETARY OF THE NAVY, JOHN
PHELAN, UNITED STATES OF AMERICA,
in his official capacity,
1000 Navy Pentagon
Washington, DC 20350,

    Defendant.

---------------------------------------------------------------X

CASE NO. _____

# COMPLAINT

This is an action for judicial review of the United States Navy's unlawful denial of traumatic injury protection to provide to Special Warfare Chief Petty Officer Joseph Dawson (Ret.) ("Chief Dawson") under the terms of the Servicemembers' Group Life Insurance Traumatic Injury Protection Program ("TSGLI") program. On October 4, 2024, the Navy Casualty Office denied Chief Dawson's TSGLI claim for an L1 vertebrate injury sustained in a military parachuting accident. That decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. The Navy denied benefits on the asserted basis that Chief Dawson failed to provide a "timeline" of treatment, even though no such requirement exists under the governing statute or regulations. In addition, the Navy failed to grapple with non-frivolous contrary evidence, including medical nexus statements provided by medical professionals and statements by Chief Dawson's caregiver, such that the Navy's decision is unsupported by the administrative record. By ignoring relevant evidence and by demanding that Chief Dawson meet extra-statutory hurdles, the Navy

1

rendered a decision that was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. Chief Dawson respectfully asks this Court to reverse the Navy's denial and order the payment of TSGLI benefits to which he is entitled.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (actions under the Administrative Procedure Act ("APA")); 28 U.S.C. § 1331 (actions arising under the laws of the United States); and 38 U.S.C. § 1975 (actions under the Servicemembers' Group Life Insurance statute).

2. The agency action from which Chief Dawson seeks relief occurred on October 4, 2024, when the Navy Casualty Office denied his appeal for TSGLI benefits in violation of the APA. Chief Dawson timely files this complaint within the six-year statute of limitations required for actions brought under the APA. 28 U.S.C. § 2401(a).

3. Venue is proper pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which the defendant is the United States of America acting by and through the Department of the Navy, an agency of the United States government. On information and belief, the United States Navy is headquartered at 1000 Navy Pentagon, Washington, DC 20350.

## PARTIES

4. Chief Dawson is a United States citizen and a resident of Drain, Oregon. Chief Dawson served in the United States Navy and retired in 2018 because of an injury sustained at Fort Benning, Georgia.

5. Defendant John Phelan is the Secretary of the United States Navy and is named solely in his official capacity. He is the chief officer of the United States Navy, and he exercises authority, direction, and control over the United States Navy. Defendant Phelan is authorized by 10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy

2

when he considers it necessary to correct an error or remove an injustice. Upon information and belief, Defendant Phelan performs a significant amount of his judicial duties within the District of Columbia.

## FACTUAL BACKGROUND

### A. The Traumatic Servicemembers' Group Life Insurance Program

6. In 2005, Congress enacted the TSGLI program under the Servicemembers' Group Life Insurance ("SGLI") to mitigate the inevitable financial hardships that service members and their families incur when service members are forced to endure a lengthy recovery and rehabilitation period because of a traumatic injury. *See* Pub. L. No. 109-13, § 1032(a)(2), 119 Stat. 231 (2005); *accord Sorkness v. United States*, No. 17-2248, 2019 WL 4451990, at *1 (D.D.C. Sept. 17, 2019); *Hayes v. United States*, No. 21-362 (JEB), 2022 U.S. Dist. LEXIS 127295, at *2 (D.D.C. July 19, 2022).

7. Under the program, servicemembers are "automatically . . . insured for traumatic injur[ies]." 38 U.S.C. § 1980A(a).

8. TSGLI benefits are payable for any traumatic injury that occurs on or after December 1, 2005 that results in a qualifying loss. *Id*.

9. To be eligible, a service member must have (i) been insured by TSGLI on the date of the traumatic injury[1] caused by a traumatic event[2]; (ii) suffered a scheduled loss that results

---

[1] A traumatic injury is defined as "physical damage to a living body that is caused by a traumatic event." 38 C.F.R. § 9.20(c)(1).

[2] A traumatic event is defined as "damage to a living being occurring on or after October 7, 2001, caused by: (i) application of external force; (ii) application of violence or chemical, biological, or radiological weapons; (iii) accidental ingestion of a contaminated substance; (iv) exposure to low environmental temperatures, excessive heat, or documented non-penetrating blast waves; or (iv) an insect bite or sting or animal bite." *Id.* § 9.20(b)(1).

directly from a traumatic injury and; (iii) survived for at least seven days following the traumatic injury; and (iv) suffered a scheduled loss within two years of the traumatic injury before the termination of his duty status. 38 C.F.R. § 9.20(d)(1)-(5).

10. "Qualifying losses" include the "inability to carry out the activities of daily living" ("ADLs"), meaning the "inability to independently perform two or more of the following six functions: bathing, continence, dressing, eating, toileting, [and] transferring." 38 U.S.C. § 1980A(b)(1), (2)(D)(i)–(vi); 38 C.F.R. § 9.21(a)(9)(i)–(vi) (further defining the six functions).

11. The inability to carry out ADLs "means the inability to perform at least two of the six [] functions without assistance from another person, even while using accommodating equipment or adaptive behavior." 38 C.F.R. § 9.21(a)(9). The Department of Veterans Affairs ("VA") elaborates that a person cannot independently perform an ADL if they require physical,[3] stand-by,[4] or verbal assistance.[5] U.S. Dep't of Veterans Affs., Traumatic Injury Protection Under Servicemembers' Group Life Insurance (TSGLI): A Procedural Guide 23 (Apr. 2023), https://www.benefits.va.gov/insurance/docs/TSGLIProceduresGuide.pdf ("TSGLI Procedural Guide").

12. A service member's qualifying ADL losses must be sustained for at least 15 consecutive days. The amount payable at the 15th consecutive day of ADL loss is $25,000, the amount payable at the 30th consecutive day is an additional $25,000, the amount payable at the

---

[3] Physical assistance requires a caregiver to give hands-on assistance for safe performance of the ADL. TSGLI Procedural Guide at 55.

[4] Standby assistance requires a caregiver to be within arm's reach to allow for safe performance of the ADL. *Id.*

[5] Verbal assistance requires a caregiver to give verbal cues or instructions to allow for safe performance of the ADL. *Id.*

60th consecutive day of ADL loss is an additional $25,000, and the amount payable at the 90th consecutive day is an additional $25,000. In short, the maximum potential benefit is $100,000 for 90 consecutive days of the inability to carry out ADLs. 38 C.F.R. § 9.21(c)(20).

13. To file an initial claim for benefits, a service member must complete form SGLV-8600. The form consists of two parts: Part A, completed by the service member, and Part B, which must be completed by a medical professional. Part B prompts the reviewing medical professional to certify that the claimant meets the TSGLI application criteria described above. Chief Dawson's renewed initial claim, submitted on June 22, 2022, was certified by Dr. Norbert P. Gerondale.

14. A servicemember's branch is responsible for determining whether an individual is covered by the TSGLI and sustained a qualifying loss. 38 U.S.C. § 1980A(f). These determinations are made using the preponderance of the evidence standard. *Rich v. United States*, 369 F. Supp. 3d 263, 274 (D.D.C. 2019) (citing SECNAV Instruction 1770.4 § 3(e)(2)).

15. In reviewing claims for TSGLI benefits, the Navy must consider all relevant evidence, including both medical and lay evidence. 38 U.S.C. § 5107(b); 38 C.F.R. § 9.20(g)(3).

16. Courts have found that an agency's failure to consider, or to discount, first-hand caregiver statements without explanation may render an agency's decision to deny TSGLI benefits arbitrary and capricious. *Rich*, 369 F. Supp. 3d at 274–76 (citing *Blackwood v. United States*, 187 F. Supp. 3d 837, 846-47 (W.D. Ky. 2016); *Carver v. United States*, No. 3:15CV-00401-JHM, 2016 WL 2654087 (W.D. Ky. May 9, 2016)).

17. If an application for benefits is denied, service members may appeal adverse determinations through a three-level process within their service branch before seeking review from a federal district court. 38 U.S.C. § 1975; 38 C.F.R. § 9.20(h)(1).

18. If a service member's TSGLI claim or appeal is denied by the service branch, however, they need not exhaust their administrative remedies before challenging the denial in federal court under the APA. *Moreno v. Spencer*, 310 F. Supp. 3d 83, 86 (D.D.C. 2018) (citing 38 U.S.C. § 1975; 38 C.F.R. § 9.20) ("Administrative exhaustion is not required for judicial review under the APA for a service member's TSGLI claim.").

**B.   Chief Dawson's Service And Traumatic Injury**

19. Chief Dawson enlisted in the Navy on October 6, 2004. His enlistment contract included a United States Navy Sea, Air, and Land ("SEAL") challenge program guarantee.

20. After Chief Dawson successfully completed basic training, he attended Basic Underwater Demolition/SEAL ("BUD/S") training, which he successfully completed on February 3, 2006.

21. On February 10, 2006, Chief Dawson began Basic Airborne Course at Fort Benning, Georgia. On March 1, 2006, during his fourth jump of the day, Chief Dawson suffered a burst fracture of the L1 vertebrae when he accidentally landed in a seated position while performing an airborne training exercise.

22. As a result, Chief Dawson was hospitalized from March 1, 2006 to March 6, 2006 and placed in a thoracic lumbar sacral orthosis ("TLSO") brace to stabilize his spine and restrict movement. Chief Dawson was discharged from the hospital with explicit instructions that required him to wear the brace at all times when not in bed.

23. A TLSO is a rigid back brace that extends from the upper chest to the pelvis and immobilizes the thoracic, lumbar, and sacral spine following traumatic injury. It prevents bending, twisting, and, in certain models, such as the one prescribed to Chief Dawson, even sitting upright, thereby severely limiting the ability to perform daily activities without assistance. *See* St. Vincent's

Hospital Melbourne, *Thoracic Lumbar Sacral Orthosis (TLSO)*, 2 (patient guide) (attached as Exhibit A). The TLSO requires a patient to lie flat while a helper slides the brace underneath, tightens the waist strap, and attaches the shoulder straps. *Id.*

24. Because the TLSO could only be applied with assistance, and because Chief Dawson's treating providers instructed him to wear it at all times when out of bed—including while sitting, standing, walking, dressing, and toileting—he was unable to independently perform numerous essential activities of daily living independently. He could not transfer, dress, bathe, or toilet without help, as the TLSO had to be in place whenever he was not lying down.

25. On March 9, 2006, Chief Dawson was placed on 30 days of convalescent leave (*i.e.* military leave to recover from an injury) and instructed to abide by several limitations, such as no weightbearing. Chief Dawson required hydrocodone—an opioid medication—every four to five hours to control his pain. Opioid medications are a pharmaceutical treatment "significantly associated with increased risk of falling." NAT'L. INST. OF HEALTH, Lotta J. Seppala et al., *Fall-Risk-Increasing Drugs: A Systematic Review and Meta-analysis: III*, J. AM. MED. DIR. ASSOC. vol. 19, 4 (2018) 372.e1-372.e8, available at https://pubmed.ncbi.nlm.nih.gov/29402646/.

26. On March 10, 2006, Chief Dawson attended a follow-up visit with his orthopedist where his orthopedist decided to transition Chief Dawson from a TLSO brace to a Jewett brace because the TLSO was so restrictive that it did "not allow patient to wear brace while sitting."

27. The transition, however, was not immediate. Medical notes indicate that Chief Dawson continued to wear his TLSO brace "24 h[ou]rs a day unless showering or sleeping" through at least March 20, 2006. Thus, from March 1 through March 20, 2006, Chief Dawson could not toilet, transfer, or dress independently, and instead required direct caregiver assistance with each of these activities.

28.     On March 21, 2006, Chief Dawson began wearing his prescribed Jewett brace, "a hyperextension brace," which like the TLSO prevented him from bending forward too much. *See Cadovee v. United States*, No. 5:22-cv-00492-MCS-SP, 2023 U.S. Dist. LEXIS 54738, at *4-5 (C.D. Cal. Mar. 29, 2023).

29.     The Jewett brace also required careful positioning and secure strapping to achieve proper immobilization. Applying or removing the brace necessitated that Chief Dawson lie down, log-roll, and rely on a helper to slide the front and back components into place and fasten the latches. *See* UW Health Orthotics Clinic, *Your Jewett Spinal Orthosis (Brace) at Home*, https://www.uwhealth.org/orthotics/jewett-brace-instructions.

30.     Because Chief Dawson could neither don nor remove his required Jewett brace independently—and because the brace restricted mobility necessary for safe sitting, standing, transferring, and other daily tasks—he remained unable to perform essential activities of daily living without assistance. Medical records confirm that this brace-related limitation "restricted mobility . . . and limited physical activity . . . from 3/6/2006 – 6/5/2006," during which he required hands-on or stand-by help for toileting, transferring, and dressing.

31.     Caregiver reports confirm these limitations: Chief Dawson required physical and stand-by assistance "getting on and off the toilet," help with cleaning due to inability to twist, transfers in and out of the tub/shower, and assistance with dressing, including socks, shoes, pants, and zippers.

32.     Specifically, when bathing, Chief Dawson had to be extra careful not to fall because his back was not protected by a brace, which he took off for showering. Given this need for extra safety, Chief Dawson relied on his wife Lisa Dawson's physical and stand-by assistance to transfer "in and out of the tub and shower."

33. In addition, not wanting to worsen his condition, or to cause himself pain, Chief Dawson relied on Lisa Dawson to "scrub[] his back with the sponge as to limit any twisting or bending of the affected vertebrae."

34. For dressing, Lisa Dawson provided physical and stand-by assistance by putting on Chief Dawson's "socks, tying his shoes, putting on his pants, and assisting with zipping and unzipping his pants/shorts" because with the TLSO he could not sit or bend, and with the Jewett brace, his forward flexion remained limited.

35. For transferring, Chief Dawson required physical and stand-by assistance because he had to log-roll in a prone or side-lying position so the brace could be applied, and then be helped from that position to sitting and upright posture. Medical notes further confirm that Chief Dawson needed assistance "getting from prone position in bed to upright position to be placed in brace."

36. These limitations were confirmed by Chief Dawson's certifying physician, Dr. Norbert P. Gerondale, who noted that Chief Dawson injury was "considered as higher risk" and that the brace "precluded him from completing ADLs independently. Those [ADLs] include bathing, toileting and dressing."

37. Chief Dawson was also prescribed intensive, opioid-based pain treatment, increasing his reliance on his wife for the performance of ADLs to ensure his safety.

38. With time and diligent use of his back braces, Chief Dawson's back condition improved. By June 5, 2006, Chief Dawson was no longer required to wear his Jewett brace such that he could independently perform all of his ADLs.

39. Given the length of his qualifying loss, Chief Dawson applied for TSGLI benefits since he: (1) was insured by TSGLI at the time of his injury; (2) suffered a scheduled loss within two years of his traumatic injury—as he could not independently perform four ADLs (*i.e.*, bathe,

dress, toilet, and transfer) for 90 consecutive days; (3) survived at least seven days following his traumatic injury from March 1, 2006-present; and (4) suffered his traumatic injury before the termination of his duty status in 2018.

### C.     Chief Dawson's Initial TSGLI Claims and Appeal

40.    To date, Chief Dawson has filed five separate TSGLI claims and appeals with the Navy seeking compensation for the scheduled loss he clearly suffered following his 2006 jump injury.

41.    On August 15, 2024, Chief Dawson filed his most recent appeal, which included (i) a brief explaining that the preponderance of the evidence demonstrated that Chief Dawson required physical and stand-by assistance to bathe, toilet, dress, and transfer from March 6, 2006 to June 5, 2006; (ii) Lisa Dawson's sworn caregiver statement; (iii) Captain Rosenthal's letter; and (iv) medical records evidencing Chief Dawson's inability to perform the four ADLs for 90 days.

42.    On October 2, 2024, the Navy Personnel Command solicited an opinion from the Chief of the Bureau of Medicine, which recommended denying Chief Dawson's TSGLI claim in a three paragraph memorandum for the record. The memorandum recommended denial because "[a] thorough review of all available information was conducted" and "[t]he available information DOES NOT support the schedule loss of at least two activities of daily living (ADLs) for at least 30 days."

43.    On October 4, 2024, the Navy Personnel Command issued a decision denying Chief Dawson's TSGLI claim. The decision stated that to "approve your claim, we need evidence addressing the specific injury/injuries you sustained as a result of the traumatic event and a timeline of treatment up to the first 120 days of recovery. The timeline of treatment would consist of notations from licensed medical providers such as physicians, physician assistants, nurse

10

practitioners, registered nurses, etc." The decision also indicated "[s]upporting documentation can also be submitted by other medical providers acting within the scope of their practice, pertinent to the sustained injury/injuries, to include occupational/physical therapists . . . ."

44. This October 4, 2024 denial constitutes the Navy's final agency action. In issuing it, the Defendant failed to acknowledge or address Captain Rosenthal's letter, Lisa Dawson's sworn caregiver statement, or the medical records and certification provided.

45. The Navy also failed to address the Board for Correction of Naval Records ("BCNR") decisions Chief Dawson included in his brief, which demonstrated a TSGLI award for ADL loss in similar situations.

### D. The Navy's Denial of TSGLI Benefits to Chief Dawson Was Arbitrary, Capricious, Contrary to Law, and Unsupported By Substantial Evidence.

46. The Navy's decision to deny Chief Dawson TSGLI benefits was arbitrary, capricious, contrary to law, and unsupported by substantial evidence because it failed to follow applicable legal standards, added an unauthorized evidentiary requirement, and failed to engage with critical record evidence.

47. Had the proper standard been followed, Chief Dawson would have been awarded a TSGLI payment for 90 days of ADL loss.

48. Courts have repeatedly held that an agency acts arbitrarily and capriciously when it bases decisions on factors Congress did not intend it to consider, or when it imposes undocumented criteria. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Here, the plain language of the TSGLI statute, 38 U.S.C. § 1980A, requires only that a service member show a "qualifying loss," including the inability to independently perform at least two ADLs for 30 or more consecutive days due to a traumatic injury. Nothing in the statute requires a "timeline of treatment."

49. Similarly, the VA's TSGLI Procedural Guide does not require a chronological "timeline" from licensed providers.

50. By requiring a timeline, the Navy imposed an extra-statutory burden contrary to the governing law. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

51. The APA requires agencies to examine all relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the decision made. *See id*. The Navy's decision, and the memorandum it relies on, is unduly brief and lacks meaningful engagement with the evidence submitted, such as the sworn caregiver statement, the medical certification, and other documentation supporting the claim.

52. Instead of explaining how it considered this evidence, the Navy simply restates an arbitrary and unfounded requirement for a "timeline of treatment" and that Chief Dawson's claim should be denied. By doing so, the Navy fails to demonstrate the required rational connection between the record evidence and its decision to deny the claim. This lack of reasoned explanation renders the Navy's decision arbitrary and capricious. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

53. An agency's failure to consider, or to discount, first-hand caregiver statements without explanation may render an agency's decision to deny TSGLI benefits arbitrary and capricious. *Rich v. United States*, 369 F. Supp. 3d 263, 274–76 (D.D.C. 2019). Despite that clear mandate, the Navy failed to consider, or even reference, Lisa Dawson's caregiver statement without explanation, rendering the Navy's decision arbitrary, capricious, contrary to law and unsupported by substantial evidence.

54. Further, the Navy failed to grapple with the mechanical limitations of the TLSO and Jewett braces themselves, which by design required assistance to wear and remove.

55. The TLSO and Jewett braces were required at all times except while sleeping or showering. Critically, Chief Dawson could transfer to the toilet or shower only while wearing or removing the braces, a process that required hands-on assistance from a caregiver. Even if medical documentation were incomplete or imprecise, the undisputed mechanics of the braces establish that Chief Dawson could not possibly perform ADLs independently. By ignoring these fundamental, mechanical facts, the Navy failed to consider a core element of the claim, rendering the denial arbitrary and capricious.

56. Finally, this Court has held that service branches act arbitrarily, capriciously, and without support of substantial evidence when they fail to adhere to their own precedent without explanation. *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011). Here, the Navy gave no explanation for why it did not adhere to the BCNR cases relied upon by Chief Dawson that awarded TSGLI benefits for ADL loss to service members in TLSO and Jewett braces.

## COUNT 1

**Violation of the Administrative Procedure Act
The Defendant's Denial of TSGLI Benefits Was Arbitrary, Capricious,
Unsupported by Substantial Evidence, and Otherwise Not In Accordance With Law
(5 U.S.C. § 706(2)(A))**

57. Plaintiff incorporates the allegations in paragraphs 1 through 56 above.

58. The Navy's decision to deny Chief Dawson's TSGLI claim for 90 days of ADL loss is subject to judicial review as a final agency action under the APA. 5 U.S.C. §§ 551(13), 701, 704.

59. Under the APA, this Court must set aside a final agency action that is arbitrary, capricious, unsupported by substantial evidence, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A).

60. The Navy's final decision denying Chief Dawson TSGLI benefits violated the APA. The Navy acted arbitrarily, capriciously, without support of substantial evidence, and contrarily to law for multiple reasons.

61. First, the Navy failed to meaningfully engage with the core evidence submitted, including sworn caregiver statements, medical certifications, and contemporaneous records documenting that Chief Dawson required TLSO and Jewett braces, which he required assistance to wear and remove, in order to transfer, toilet, shower, and dress. The Navy failed to explain why such evidence was insufficient to merit TSGLI benefits.

62. Second, the Navy imposed an extra-statutory requirement for a "timeline of treatment" with notations from licensed medical providers. TSGLI determinations require only that a preponderance of evidence—medical or lay—demonstrate that a service member could not independently perform at least two ADLs for the requisite period. *Rich v. United States*, 369 F. Supp. 3d 263, 274 (D.D.C. 2019) (citing SECNAV Instruction 1770.4 § 3(e)(2)); 38 U.S.C. § 1980A(b)(2)(D). There is no requirement for a chronological timeline from medical professionals. By imposing this requirement, the Navy acted contrary to law. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Chief Dawson has suffered a legal wrong as a result of the Navy's arbitrary, capricious, unlawful, and factually unsupported decision to deny his TSGLI benefits.

63. Third, the Navy failed to cite or follow precedent favorable to Chief Dawson's claim. This Court has held that a service branch acts arbitrarily and capriciously when it fails to adhere to its own prior decisions or agency precedent without explanation. *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011). Here, the Navy ignored BCNR cases awarding TSGLI

14

benefits for members in TLSO and Jewett braces, providing no rationale for declining to follow these prior determinations.

64. Fourth, the Navy's denial was unreasoned and conclusory, lacking any rational connection between the evidence submitted and the decision to deny benefits. The Navy's decision merely restates the arbitrary requirement of a treatment timeline without addressing how the core evidence failed to establish ADL loss. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

65. As a result of the Navy's decisions, Chief Dawson was and continues to be deprived of the TSGLI benefits to which he is entitled.

66. Chief Dawson should be awarded a TSGLI payment for 90 days of ADL loss.

## PRAYER FOR RELIEF

1. Chief Dawson prays for the Court to:

    a. Award $100,000 in TSGLI program benefits plus interest, which are formulaic in nature, or in an amount to be determined by the Court;

    b. award interest, costs and attorney's fees as provided by statute; and

    c. grant such other and further relief as the Court may deem just and proper, including, but not limited to, payment of Plaintiff's reasonable costs and attorney's fees.

Dated:  January 9, 2026                     Respectfully submitted,


By:  /s/ John R. Bobka

John R. Bobka
D.C. Bar No: 1722135
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 419-2056
Fax: (202) 778-2201
jbobka@hunton.com

Jae Lynn Huckaba (*pro hac vice* forthcoming)
Hunton Andrews Kurth LLP
Wells Fargo Center
333 SE 2nd Avenue, Suite 2400
Miami, FL 33131
Phone:  (305) 810-2500
Fax:  (305) 810-2460
jhuckaba@hunton.com

Esther Leibfarth
D.C. Bar No: 10164515
Rochelle Bobroff
D.C. Bar No. 420892
National Veterans Legal Services Program
1100 Wilson Blvd, Suite 900
Arlington, VA 22209
Phone:  (202) 621-5709
Fax:  (202) 223-9199
esther@nvlsp.org
rochelle@nvlsp.org

*Counsel for Special Warfare Chief Petty Officer Joseph Dawson (Ret.)*